*944 OPINION.
Arnold:
The rule is established that, where bonds are issued for less than their face value by a corporation on the accrual basis, the difference between the amount realized and the face value of the issue will be recognized as bond discount. Helvering v. Union Pacific Railroad Co., 293 U. S. 282; Hummel-Ross Fibre Corporation, 31 B. T. A. 451; *945 affd., 79 Fed. (2d) 474. A concise statement of the discount concept is contained in New York, Chicago & St. Louis Railroad Co., 23 B. T. A. 177, 196, which was quoted with approval in Dodge Bros., Inc. v. United States, 118 Fed. (2d) 95. The applicable regulations provide for the amortization of bond discount over the life of the bonds. Art. 22 (a)-18, Regulations 86 and 94, Revenue Acts of 1934 and 1936. Both parties have applied the rule to the transaction of December 30,1931, but with different results. Since the principle of amortizing bond discount over the life of the bonds is recognized by the parties, we need determine only the correct amount to be prorated.
An analysis of the conflicting claims shows that different amounts were determined as bond discount because of the variance in treatment of the consideration for the 1,499,000 shares of stock issued on December 30,1931. Petitioner, in reliance on the offer made by its creditors and accepted by its directors and stockholders, allocated $2,900,000 of the notes with accrued interest to the 1,499,000 shares of no par capital stock issued. Respondent refused to accept the allocation and determined the bond discount to be the difference between the aggregate notes with accrued interest and the par value of the bond issue, i. e., $878,212.28, plus $44,940.33, representing costs of printing the bonds, stamps, fees, etc., or a total bond discount of $923,152.61.
Respondent contends that the amortization of bond discount is only a concept which should not be extended to cover transactions in which the substance of what was done fails to disclose that the bonds were actually issued under circumstances equivalent to a “discount” as the term is used in the regulations. He argues that the notes were exchanged for bonds, and that stock (1,000 shares) was exchanged for new stock (1,500,000 shares) as integral parts of a single or entire transaction, citing Dodge Bros., Inc. v. United States, supra. He insists that if his first contention is rejected, nevertheless, the Board should not find that the stock had a fair market value on December 30,1931, of $3,000,000, or any market value whatsoever, citing Hummel-Ross Fibre Corporation v. Commissioner, 79 Fed. (2d) 474. Finally he points out that the evidence discloses that petitioner had no dividend record at December 30,1931, or for several years thereafter, that the face value of its bonded indebtedness exceeded the capital invested, and that, because of market conditions and the speculative nature of petitioner’s enterprise, no purchaser could have been found for its stock.
We can not agree with respondent’s contentions. In our opinion he properly recognized petitioner’s right to amortize bond discount under the particular facts of this case. As to his second contention, respondent has stipulated that petitioner’s creditors offered to sur- *946 pender all of its -outstanding 8 percent notes with aocrued interest “for cancellation in exchange and consideration for the issuance to .them” of 1,499,000 shares of stock and $60,000,000 par value of bonds. This offer was verbal. It was submitted as the result of an agreement reached after numerous conferences between 15 to 20 representatives of petitioner’s creditors. The unconfcradicted testimony of the witnesses shows that the creditors collectively agreed to -accept as payment for their notes and interest -sufficient shares of petitioner’s common stock which, with stock then outstanding, would equal 1,500,000 shares at $2 per share and $60,000,000 face value of bonds at a discount price of approximately 93%.
This offer was -accepted by petitioner’s directors and stockholders as made. The entries on petitioner’s books of account and the resolutions adopted by its stockholders and directors clearly reflect the .acceptance and the intention of the parties that 1,499,000 shares of .additional stock would be issued to “the holders of the notes * * * in full payment” for $2,900,000 of the notes and interest, so that “after the issuance thereof” the capital of the petitioner “shall be Three Million Dollars ($3,000,000)..” The creditors, therefore, subjected $2,900,000 to the risk of the business. No stock-for-stock exchange (1,500,000 shares for 1,000 shares) was established despite the vigorous cross-examination of petitioner’s witnesses as to the mechanics of the transfer.
Bespondent’s final contention is that petitioner’s stock had no value. Value or the lack of it is of importance in determining whether the allocation of consideration as made by the parties between the stock and the bonds was reasonable. The fact that petitioner was newly organized at December 30,1931, and without any earnings or dividend record does not necessarily prove that the .stock lacked value. Its assets, tangible and intangible, indicate that there was value behind the stock. Petitioner’s tangible assets consisted of the bonds of the Texoma Natural Gas Co., and the pipeline and facilities necessary to transport natural gas from Oklahoma to Illinois. In addition, petitioner had intangible assets at December 30, 1931, which, in our opinion, were very valuable, namely, its contracts for the supply and sale of natural gas. By its supply contracts petitioner assured itself of natural gas of at least 210,000,000 cubic feet daily whieh was the total -capacity of its pipeline. By its sales contract petitioner was assured of an annual profit of $900,000 from approximately 63 percent of its daily capacity. That the remaining 37 percent of its pipeline capacity was sold at a profit is established by petitioner’s stipulated net income for the years 1935 to 1939, inclusive. These contracts must be considered corporate assets. Obviously the contracts were of *947 great value to petitioner and their value must be weighed and considered in determining whether the capital stock had value.
Expert testimony was offered by both parties regarding the value or lack of value of the capital stock on December SO, 1981. Despondent’s expert witness, after testifying to the dismal condition of the security market in December 1931, expressed the opinion that the assets reflected on petitioner’s 1931 return, which was not introduced in evidence, indicated that the stock was without Value. He admitted on cross-examination that he gave no consideration to the contracts held by petitioner.
On the other hand petitioner’s expert, whose qualifications are recognized by respondent, testified that in his opinion the shares could have been sold if placed oh the market on or about December 30,1931. He testified that the purchasers would have been parties seeking to double or treble their investment rather than investors seeking a reasonable return thereon, but he thought the nature of the business, the sponsors and management of the enterprise, the contracts held by petitioner, and the potential earning capacity of the capital stock would have secured purchasers for the stock at two dollars per share. This witness also testified that, had petitioner’s bond issue been sold on the market, the bond discount would have been considerably in excess of $3,778,212.28. He supported his opinion by specific instances of financing by public utilities late in 1931 and early in 1932 in which the percentage realized on -bond issues by operating companies with established earning capacities was much less than that realized by petitioner.
After carefully weighing and considering the stipulated facts and the testimony, it is our opinion that the parties intended to and did fix the value of the petitioner’s stock at $2 per share. We are further of the opinion that the amount so fixed is reasonable and is justified by the facts peculiar to this case. By accepting the offer of its creditors, petitioner reduced its interest rate from 8 percent 'to less than 6y2 percent, since $3,778,212.28 spread over the 15-year life of the bonds is less than % of 1 percent of the face 'amount of the bonds. If petitioner had been able to sell this bond issue oh the market in December 1931, the testimony of the expert witnesses •clearly establishes that the bond discount' would have exceeded the amount of discount that will be paid to petitioner’s creditors under the present facts. We hold, therefore, that the amount of bond discount to be amortized by petitioner over the life of its bonds is $3,778,212.28.
Reviewed by the Board.

Decision will he entered, under Bute 50.